Terry Jennings, Justice
A jury found appellant, Francisco Guzman, guilty of the offense of capital murder.[1] Because the State did not seek the death penalty and appellant was a juvenile when he committed the offense, the trial court, as statutorily required, assessed his *398 punishment at confinement for life.[2] The trial court further found that appellant used a deadly weapon, namely, a knife, in the commission of the offense. In three issues, appellant contends that the trial court erred in denying his request for a jury instruction on spoliation of the evidence, his trial counsel provided him with ineffective assistance, and the statutes under which he was sentenced violate the Eighth Amendment's prohibition against cruel and unusual punishment.[3]
We affirm.
Background
Patricia Rodriguez ("Patricia") testified that in November 2004, she lived at home with her parents, Maria Manzo ("Manzo") and Alejandro Rodriguez ("Alejandro"); three sisters, Acuzena Rodriguez ("Suzanna"), Maria Rodriguez ("Maria"), and Rufina Rodriguez, the complainant[4] ; and her cousin, appellant. Patricia explained that on November 8, 2004, she and Maria rode a bus home from school. When they arrived, the front door was locked, but appellant, who was home at the time, let them into the house. Maria then went upstairs, and Patricia walked straight to a telephone in the kitchen to call her boyfriend. As she tried to make her telephone call, appellant stood behind her. When she discovered that the telephone was "dead," appellant confirmed that "the phone wasn't working," and she walked to her parent's master bedroom to try to use the telephone located in there. Appellant followed Patricia into the master bedroom and stood behind her as she tried to make her telephone call. When she realized that this telephone was also "not working," she tried to leave the master bedroom. Appellant, however, punched Patricia's face with his fist, and she believed that "he was going to kill [her]."
After appellant punched Patricia, he threw her onto the floor and began stabbing her in the chest, neck, arms, and back with a knife. He cut her arms as she raised them to her face to protect herself. Appellant stabbed Patricia eight times, the attack lasted for "about ten minutes," and once he had stopped stabbing her, she fled to the "dressing area" of the master bedroom. At that point, Maria came into the master bedroom, and appellant "grabbed a pole and hit her [o]n the head."
When Patricia saw Maria again, she was walking to the bathroom area in the master bedroom and screaming. Patricia then heard appellant tell Maria that if she would not be quiet, "he was going to cut out her tongue." Further, Patricia heard appellant "taping" Maria. He also "pushed [Patricia] inside the [master-bedroom] closet" and "duct tape[d]" her hands, mouth, and legs. Appellant then left the master bedroom when Patricia's mother, Manzo, came home.
When appellant returned to the master bedroom with Manzo, they began talking. Hearing her mother, Patricia tried to help, but appellant "ran after [Patricia] and stabbed [her] in [the] back." Patricia thereafter remained in the master-bedroom closet until her mother came and got her after the entire attack was over. Patricia's sister, Suzanna, called for emergency assistance.
*399 Patricia further testified that after appellant had stabbed her, she felt dizzy, could not breathe, and bled "a lot." She pretended to be dead so that appellant would "stop stabbing [her] or doing something else." And following the attack, emergency medical personnel took Patricia to a hospital, where she stayed for two months following surgery. Patricia further explained that although Manzo, prior to the day of the attack, had placed a lock on the door of the master-bedroom closet, on the day of the attack, the closet door and lock were broken.
Manzo testified that appellant, her sister's son, lived with her family in 2004. While he was living with them, Manzo noticed that certain items would go missing from the home. This prompted her to place a lock on the master-bedroom closet, where she kept "[a]ll the gold that belonged to [her] daughters and [her] family." Manzo also noted that in November 2004, she owned a truck, which appellant did not have permission to drive.
On November 8, 2004, Manzo went to work, and she later returned home at the same time as Suzanna and the complainant. When they entered the house, appellant, who was in the living room, told Manzo that "he had problems and he wanted to talk to [her] in the [master] bedroom." After they entered the master bedroom, appellant told Manzo that "somebody had broken into [the house] to steal" and "he had ... kill[ed]" that person. Seeing the blood in the bedroom, she tried to comfort appellant. Manzo then heard "[g]roaning or crying," and as she tried to walk toward the dressing area and closet, appellant stabbed her in the stomach with a knife. He then threw her to the floor, saying, "Give me your money." (Internal quotations omitted.) After Manzo gave him $700 that was in her pocket, appellant continued attacking her, stabbing her on her head, arms, face, legs, and chest, about fifteen times, causing her to bleed "[a] lot."
Once Manzo was down on the floor, appellant yelled, "Suzanna. Suzanna. Your mom fell." (Internal quotations omitted.) When Suzanna came toward the master bedroom, he "stabbed her in the stomach." However, she was able to flee to the home's hallway bathroom. Finally, when the complainant came "run[ning]" toward the master bedroom "to see what was going on," appellant "grabbed her from her hand" and stabbed her in the chest "a lot." Seeing appellant stab the complainant, Manzo tried to "pull[ ] her away from him." Appellant then proceeded to stab Manzo in the "upper chest or ... shoulder area." When appellant stopped attacking Manzo, he said, "Don't move. Stay there." (Internal quotations omitted.) He then left the house, driving away in Manzo's truck. Manzo found Patricia in the closet in the master bedroom and Maria in the master-bedroom bathroom, tied up with duct tape. Emergency medical personnel took Manzo, Patricia, Suzanna, Maria, and the complainant to a hospital. Manzo required surgery and stayed in the hospital for two weeks.
Manzo further testified that appellant did not have permission to take $700 from her. And after the attack, she discovered that a jewelry box and her jewelry, which she did not give anyone permission to take, were missing from the master-bedroom closet.
Dr. Francis Welsh testified that in November 2004, he was an attending trauma surgeon at Ben Taub Hospital when the complainant, who did not have a pulse and was not breathing, arrived at the hospital. She had sustained "multiple stab wounds to her chest" and her "lower extremities." She had also sustained injuries to her lungs and a laceration to the left ventricle of her heart. Welsh noted that any of the *400 complainant's injuries, independently, "could [have] be[en] lethal," and when combined in the complainant's case, "they were lethal."
Dr. Morna Gonsoulin, an assistant medical examiner at the Harris County Institute of Forensic Sciences, testified that she performed an autopsy on the complainant, who died on November 8, 2004. Gonsoulin explained that the complainant had sustained four stab wounds and other injuries, including cuts, abrasions, and a subscapular hemorrhage from being "hit with something." "Stab wound number one," on the right side of the complainant's chest, was likely caused by a knife, or a similar object. It extended "from the chest ... through the muscle ... [and] cut[ ] through th[e] first rib on the right. It [went] through the rib bone. And then ... through the right lung ... to the spinal column and the junction of the rib around the third rib." And it was caused by "a great deal of force." "[S]tab wound number two," "start[ed] on the left side of the [complainant's] chest sort of in the axillary armpit and then [went] through the muscle of the chest.... It [went] through the left third rib, again cutting through another rib ... [and] through the upper lobe of the left lung.... [T]hen it [went] through the muscle on the left side of the heart, the left ventricle[,] ... all the way to the sort of middle split in the heart, or the septum." Caused by "something with a blunt end and a sharp end," like a knife, "stab would number two" was four and a half inches deep. "[S]tab wound number three" "actually went all the way through the [complainant's] wrist," "cut[ting] a groove into the head of th[e] [complainant's] radial bone." Caused by a knife or a similar object, it was consistent with a person "holding both of [her] arms in front of [her] face," with her palms up, in a defensive position. "[S]tab wound number four" was on the complainant's right thigh and about one-inch deep.
Based on the autopsy, Dr. Gonsoulin opined that the cause of the complainant's death was "stab wounds [to] the chest," and she ruled the death a homicide. She also noted that a knife, or similar object, that caused the stab wounds to the complainant was a "deadly weapon."
Spoliation Instruction
In his first issue, appellant argues that the trial court erred in denying his request for a jury instruction on spoliation of the evidence because "the sheer volume of evidence lost" shows that the State "lost or destroyed the evidence in bad faith" and "[p]ublic policy demands a remedy for such errors."
A review of jury-charge error involves a two-step analysis. Ngo v. State , 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005) ; Abdnor v. State , 871 S.W.2d 726, 731-32 (Tex. Crim. App. 1994). First, we must determine whether error actually exists in the charge, and, second, if error does exist, whether sufficient harm resulted from the error to require reversal. Ngo , 175 S.W.3d at 743-44 ; Abdnor , 871 S.W.2d at 731-32. If the defendant preserved error by timely objecting to the charge, an appellate court will reverse if the defendant demonstrates that he suffered some harm as a result of the error. Sakil v. State , 287 S.W.3d 23, 25-26 (Tex. Crim. App. 2009). We review a trial court's decision not to submit an instruction in the jury charge for an abuse of discretion. See Wesbrook v. State , 29 S.W.3d 103, 121-22 (Tex. Crim. App. 2000).
Here, appellant complains, and the State does not dispute, that the following evidence was lost in this case: (1) a surveillance videotape recording of appellant at a pawnshop on November 8, 2004; (2) "sheets of paper" containing written responses *401 from Patricia to questions asked by her father, Alejandro; and (3) an audio recorded statement of Suzanna taken in the hospital by a law enforcement officer. At trial, appellant requested that the trial court give a spoliation instruction to the jury, as follows:
And as to the proposed charge as it exists now, the defendant would request an instruction which would be on spoilation [sic] of evidence instruction, Judge, and requests instruction. And the wording similar to this would be that the Houston Police Department and the State of Texas had a duty to retain the videotape from the pawnshop, the question and answer notes taken in the hospital from the victim Patricia ..., and the cassette recorded statement of the victim Suzanna ..., that the City of Houston Police Department and/or the State of Texas destroyed, lost, or failed to produce that, the above stated evidence. You may consider that this evidence would have been unfavorable to the City of Houston Police Department and the State of Texas and would have been favorable to [appellant] ..., with said evidence being relevant to his intent and mental state at the time of the commission of the offense. We would request a similar instruction.
The trial court denied appellant's request.
Spoliation concerns the loss or destruction of evidence. Torres v. State , 371 S.W.3d 317, 319 (Tex. App.-Houston [1st Dist.] 2012, pet. ref'd). In the criminal context, when spoliation concerns potentially useful evidence, the defendant bears the burden of establishing that the State lost or destroyed the evidence in bad faith. See Ex parte Napper , 322 S.W.3d 202, 229 (Tex. Crim. App. 2010) ; Torres , 371 S.W.3d at 319-20. The duty to preserve evidence is limited to evidence that possesses an exculpatory value that was apparent before the evidence was destroyed. White v. State , 125 S.W.3d 41, 43-44 (Tex. App.-Houston [14th Dist.] 2003, pet. ref'd). A defendant must affirmatively show that the lost evidence was favorable and material to his defense. Id. at 44.
Houston Police Department ("HPD") Sergeant R. Torres testified that on November 10, 2004, he viewed the surveillance videotape recording of appellant at a pawnshop, but he was unable to retrieve the videotape recording that day. He then "ma[d]e arrangements for somebody from [HPD's] forensic video lab to come the following day [to the pawnshop] to recover it." Torres explained that HPD Officer Hooper thereafter retrieved the surveillance videotape recording from the pawnshop and "it went into the case file ... in the file room" for the HPD homicide division. The last place that Torres saw the recording was in the case file, and he was, only just prior to trial, informed that HPD was unable to produce it.
In regard to the "sheets of paper" containing written responses from Patricia to questions asked by her father, Alejandro, Sergeant Torres noted that he, on November 8, 2004, met with Alejandro who gave him the "sheets of paper." Torres, who was responsible for the case file until he retired in 2014, explained that he put the "sheets of paper" in the case file and that was the last place that he had seen them.
Sergeant Torres further testified that another law enforcement officer, HPD Officer A. Mares, obtained an audio recorded statement from Suzanna at the hospital. Torres explained that although he placed the cassette tape containing Suzanna's audio recorded statement in the case file, he, prior to trial, was informed that the audio recorded statement was "missing" from the case file.
*402 Legally, what precisely constitutes "bad faith" on the part of the State is not entirely clear. Napper , 322 S.W.3d at 231 (internal quotations omitted). However, bad faith is "more than simply being aware that one's action or inaction could result in the loss of something that is recognized to be evidence." Id. at 238. Bad faith requires a showing of "some sort of improper motive, such as personal animus against the defendant or a desire to prevent the defendant from obtaining evidence that might be useful." Id. When conduct can, at worst, be described as negligent, the failure to preserve evidence does not rise to the level of a due process violation. See Arizona v. Youngblood , 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988).
Here, there is no evidence that the State, in bad faith, lost or destroyed the surveillance videotaped recording, the "sheets of paper" containing Patricia's written responses to questions asked by her father, or Suzanna's audio recorded statement. See Napper , 322 S.W.3d at 229, 238 ; Torres , 371 S.W.3d at 320. Sergeant Torres testified that he placed each of these items in the appropriate case file, which was then placed in the HPD's homicide division file room. See, e.g. , Lansana v. State , No. 11-10-00316-CR, 2012 WL 4458175, at *4 (Tex. App.-Eastland Sept. 27, 2012, pet. ref'd) (mem. op., not designated for publication) (law enforcement officer took action to preserve computer "by booking it into evidence"). He maintained the file until he retired in 2014, and there is no record of what happened to the items after he had placed them into the case file. This evidence does not establish bad faith or a due process violation on the part of the State. See Youngblood , 488 U.S. at 58, 109 S.Ct. at 337-38 ; Napper , 322 S.W.3d at 238 ; see also Weldon v. State , No. 01-15-00779-CR, 2016 WL 3162342, at *2 (Tex. App.-Houston [1st Dist.] June 2, 2016, pet. ref'd) (mem. op., not designated for publication) (negligence does not establish bad faith); Sobel v. State , No. 09-14-00426-CR, 2015 WL 9311723, at *4 (Tex. App.-Beaumont Dec. 23, 2015, no pet.) (mem. op., not designated for publication) (destruction of surveillance videotape recording not bad faith). Further, there is no indication that any of the complained-of evidence was potentially exculpatory or useful to appellant. See Brecheen v. State , 372 S.W.3d 706, 711 (Tex. App.-Eastland 2012, pet. ref'd) ; Torres , 371 S.W.3d at 319-20 ; White , 125 S.W.3d at 43-44.
Accordingly, we hold that the trial court did not err in denying appellant's request for a jury instruction on spoliation of the evidence. See Torres , 371 S.W.3d at 319-20 (spoliation instruction not required where defendant failed to establish potentially useful evidence destroyed in bad faith).
We overrule appellant's first issue.
Constitutionality of Juvenile-Capital Offender Sentencing and Parole Scheme
In his third issue, appellant argues that the mandatory sentencing nature of Texas Penal Code section 12.31(a)(1) and Texas Government Code sections 508.145(b) and (d)(1)[5] are facially unconstitutional because *403 they violate the Eighth Amendment's prohibition against cruel and unusual punishment.[6] See U.S. CONST. amend. VIII ; see also TEX. PENAL CODE ANN. § 12.31(a)(1) (Vernon Supp. 2016); TEX. GOV'T CODE ANN. § 508.145(b), (d)(1) (Vernon 2012 & Supp. 2016).
We review the facial constitutionality of a criminal statute de novo. Ex parte Lo , 424 S.W.3d 10, 14 (Tex. Crim. App. 2013) ; Lopez v. State , 493 S.W.3d 126, 138 (Tex. App.-Houston [1st Dist.] 2016, pet. ref'd). We presume that the statute is valid and the legislature did not act arbitrarily or unreasonably in enacting it. Rodriguez v. State , 93 S.W.3d 60, 69 (Tex. Crim. App. 2002) ; Lopez , 493 S.W.3d at 138. To prevail on a facial challenge to a statute, the challenging party must establish that no set of circumstances exists under which the statute would be constitutionally valid. State v. Rosseau , 396 S.W.3d 550, 557 (Tex. Crim. App. 2013) ; see also Ex parte Flores , 483 S.W.3d 632, 639 (Tex. App.-Houston [14th Dist.] 2015, pet. ref'd) ("The burden to establish the statute's unconstitutionality rests upon the party mounting the challenge.").
Texas Penal Code section 12.31(a)(1) sets the mandatory punishment for a juvenile offender convicted of capital murder, providing:
An individual adjudged guilty of a capital felony in a case in which the [S]tate does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for:
(1) life, if the individual committed the offense when younger than 18 years of age[.]
TEX. PENAL CODE ANN. § 12.31(a)(1). And Texas Government Code section 508.145(b) establishes the minimum amount of time that a juvenile offender convicted of capital murder must serve before he becomes eligible for parole:
An inmate serving a life sentence under Section 12.31(a)(1), Penal Code, for a capital felony is not eligible for release on parole until the actual calendar time the inmate has served, without consideration of good conduct time, equals 40 calendar years.
TEX. GOV'T CODE ANN. § 508.145(b).
Appellant argues that because the Eighth Amendment requires proportionality when sentencing juvenile offenders, Texas's sentencing statutes, which do not allow for individualized or discretionary sentencing of juvenile offenders convicted of capital felonies, are unconstitutional. See U.S. CONST. amend. VIII. In support of his argument, appellant relies on the following United States Supreme Court cases: Graham v. Florida , 560 U.S. 48, 74-75, 130 S.Ct. 2011, 2030, 176 L.Ed.2d 825 (2010) (holding Eighth Amendment forbids sentence of life without parole for juvenile offender convicted of non-homicide offense);
*404 Miller v. Alabama , 567 U.S. 460, 479-80, 132 S.Ct. 2455, 2469, 183 L.Ed.2d 407 (2012) (holding Eighth Amendment forbids sentencing scheme for juvenile homicide offenders in which life without parole mandatory rather than based upon individualized sentencing assessment); Montgomery v. Louisiana , --- U.S. ----, 136 S.Ct. 718, 732, 736, 193 L.Ed.2d 599 (2016) (applying Miller retroactively).
Initially, we note that the Texas Court of Criminal Appeals and our sister appellate courts have previously rejected appellant's argument that Texas Penal Code section 12.31(a)(1) is facially unconstitutional. See Lewis v. State , 428 S.W.3d 860, 862-64 (Tex. Crim. App. 2014) ; Shalouei v. State , No. 14-15-01055-CR, 524 S.W.3d 766, 767-69, 2017 WL 924526, at *1-2 (Tex. App.-Houston [14th Dist.] Mar. 7, 2017, pet. ref'd) (addressing constitutional complaints identical to those raised by appellant in present case); Mathews v. State , 513 S.W.3d 45, 61-62 (Tex. App.-Houston [14th Dist.] 2016, pet. ref'd) ; Lewis v. State , 448 S.W.3d 138, 146 (Tex. App.-Houston [14th Dist.] 2014, pet. ref'd) ; see also Maxwell v. State , No. 03-14-00586-CR, 2016 WL 4177233, at *2-3 (Tex. App.-Austin Aug. 3, 2016, no pet.) (mem. op., not designated for publication); Henry v. State , No. 05-14-00197-CR, 2015 WL 4171938, at *1-2 (Tex. App.-Dallas July 10, 2015 pet. ref'd) (mem. op., not designated for publication) ("Texas courts have consistently held that the mandatory life sentence required under section 12.31... is not unconstitutional as cruel and unusual punishment under the Eighth Amendment.").
Further, the court of criminal appeals has specifically held that a "juvenile offender[ ] sentenced to life with the possibility of parole [is] not entitled to individualized sentencing under the Eighth Amendment," as argued by appellant in this case. Turner v. State , 443 S.W.3d 128, 128-29 (Tex. Crim. App. 2014) (reversing as-applied constitutional challenge to section 12.31(a)(1) ); see also Henry , 2015 WL 4171938, at *1-2 ; Lewis , 428 S.W.3d at 863-64 (rejecting argument juvenile offender entitled to individualized sentencing hearing before assessment of sentence of confinement for life with possibility of parole). "When the Court of Criminal Appeals has deliberately and unequivocally interpreted the law in a criminal matter, we must adhere to its interpretation under the dictates of vertical stare decisis." Mason v. State , 416 S.W.3d 720, 728 n.10 (Tex. App.-Houston [14th Dist.] 2013, pet. ref'd) ; see also Lewis , 448 S.W.3d at 146 ("We are bound to follow decisions of the Court of Criminal Appeals.").
Further, we note that our sister appellate court has also rejected appellant's argument that requiring a juvenile offender convicted of capital murder to serve forty years in prison before becoming eligible for parole is unconstitutional as a "de facto life sentence." Shalouei , 524 S.W.3d at 767-70, 2017 WL 924526, at *1-3 (addressing argument identical to one raised by appellant in instant case); see also Maxwell , 2016 WL 4177233, at *3 (rejecting argument juvenile offenders sentenced to confinement for life with possibility of parole amounts to "de facto life sentence" (internal quotations omitted)). As the Fourteenth Court of Appeals has explained, in order for us to sustain appellant's issue, we would have to hold that a forty-year mandatory sentence for a juvenile offender convicted of capital murder, before the possibility of parole, functions as a life sentence, thereby violating the Constitution's prohibition against mandatory life sentences without parole for juvenile offenders. Shalouei , 524 S.W.3d at 768-69, 2017 WL 924526, at *2 (citing Miller , 132 S.Ct. at 2469 ). However, as noted *405 by our sister appellate court, Texas law does not run now afoul of the Constitution's prohibition because "juvenile offenders in Texas do not now face life without parole at all." Shalouei , 524 S.W.3d at 769, 2017 WL 924526, at *2 (quoting Lewis , 428 S.W.3d at 864 ); see also Maxwell , 2016 WL 4177233, at *3 (Supreme Court in Miller did not require parole to be "probable," parole simply must be "possible" (internal quotations omitted)).
Further, in regard to the constitutionality of Texas Government Code section 508.145(b), which requires a juvenile offender convicted of capital murder to serve forty years before becoming eligible for parole, the Supreme Court has explained that "[a] State may remedy a Miller violation by permitting juvenile homicide offenders to be considered for parole." Montgomery , 136 S.Ct. at 736 ; Shalouei , 524 S.W.3d at 769, 2017 WL 924526, at *3. In fact, the Supreme Court, in Montgomery , highlighted, as a method of avoiding running afoul of Miller , a Wyoming statute that allows juvenile homicide offenders to be eligible for parole after twenty-five years. See Montgomery , 136 S.Ct. at 736 ("Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity-and who have since matured-will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment."); Shalouei , 524 S.W.3d at 769-70, 2017 WL 924526, at *3. Further, although the court of criminal appeals has not specifically discussed the constitutionality of the mandatory forty-year time-served requirement of Texas Government Code section 508.145(b), it has affirmed a sentence of confinement for life with the possibility of parole for a juvenile offender who was convicted of capital murder and, thus, subject to the same forty-year time-served requirement of Texas Government Code section 508.145(b). See Lewis , 428 S.W.3d at 861-65 ; Shalouei , 524 S.W.3d at 769-70, 2017 WL 924526, at *3 ; see also TEX. GOV'T CODE ANN. § 508.145(b). This serves to confirm that Texas Government Code section 508.145(b)'s requirement that a juvenile offender convicted of capital murder serve forty years before becoming eligible for parole does not equate to a sentence of life without parole. See Lewis , 428 S.W.3d at 861-65 ; Shalouei , 524 S.W.3d at 769-70, 2017 WL 924526, at *3. Accordingly, we must reject appellant's facial constitutional challenge to Texas Government Code section 508.145(b).[7] See Shalouei , 524 S.W.3d at 768-70, 2017 WL 924526, at *2-3.
Finally, appellant further asserts that the statutorily-prescribed minimum amount of time that must be served before a defendant may become eligible for parole in a case involving a deadly-weapon finding is also unconstitutional. See TEX. GOV'T CODE ANN. § 508.145(d)(1) ; Shalouei , ---S.W.3d at ----, 2017 WL 924526, at *3. In a case in which a court makes a deadly- *406 weapon finding, the Texas Government Code requires that the convicted defendant must serve the lesser of one-half of the sentence or thirty years before becoming eligible for parole. See TEX. GOV'T CODE ANN. § 508.145(d)(1). Having concluded that the mandatory nature of the forty-year time-served requirement of Texas Government Code section 508.145(b) is not unconstitutional under the Eighth Amendment, we likewise reject appellant's assertion that the shorter mandatory time-served requirement regarding deadly-weapon findings is unconstitutional. See Shalouei , 524 S.W.3d at 769-70, 2017 WL 924526, at *3.
We overrule appellant's third issue.
Ineffective Assistance
In his second issue, appellant argues that his trial counsel did not provide him with effective assistance during the guilt and punishment phases of trial because counsel did not request a jury instruction stating that "should he be found guilty of capital murder ..., he would be required to serve a minimum of 40 years before becoming eligible for parole," "conceded [a]ppellant's guilt during [closing] argument" to the jury, and did not object to appellant's sentence as unconstitutional under the Eighth Amendment.
The Sixth Amendment guarantees the right to the reasonably effective assistance of counsel in criminal prosecutions. U.S. CONST. amend. VI ; Garcia v. State , 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). To prove a claim of ineffective assistance of counsel, appellant must show that (1) his trial counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland v. Washington , 466 U.S. 668, 687-88, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984) ; Lopez v. State , 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland , 466 U.S. at 694, 104 S.Ct. at 2068. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance or trial strategy. See Robertson v. State , 187 S.W.3d 475, 482-83 (Tex. Crim. App. 2006). Appellant has the burden to establish both prongs by a preponderance of the evidence. Jackson v. State , 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). "An appellant's failure to satisfy one prong of the Strickland test negates a court's need to consider the other prong." Williams v. State , 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) ; see also Strickland , 466 U.S. at 697, 104 S.Ct. at 2069.
We note that, generally, a silent record that provides no explanation for trial counsel's actions will not overcome the strong presumption of reasonable assistance. Goodspeed v. State , 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). In the rare case in which trial counsel's ineffectiveness is apparent from the record, an appellate court may address and dispose of the claim on direct appeal. Lopez , 343 S.W.3d at 143. However, the record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law and no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of counsel's subjective reasoning. Id.
Jury Instruction
Appellant first asserts that, pursuant to Texas Code of Criminal Procedure article 37.071, section 2(e)(2)(B), he was *407 entitled to a jury instruction stating that "should he be found guilty of capital murder ..., he would be required to serve a minimum of 40 years before becoming eligible for parole," and his trial counsel failed to request it. See Act of May 21, 1999, 76th Leg., R.S., ch. 140, § 1, sec. 37.071(e), 1999 Tex. Gen. Laws 600, 600 (amended 2005) (current version at TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(e)(2)(B) (Vernon Supp. 2016)) (appellant relies upon prior version of statute).
To demonstrate deficient performance based on the failure to request a jury instruction, appellant must show that he was entitled to the instruction in the first place. See Fuentes v. State , 991 S.W.2d 267, 272 (Tex. Crim. App. 1999) ; see also Ex parte Nailor , 149 S.W.3d 125, 133-34 (Tex. Crim. App. 2004). Although appellant asserts that he, pursuant to article 37.071, section 2(e)(2)(B), was entitled to a jury instruction, we note that the section only applies "[i]f a defendant is tried for a capital offense in which the [S]tate seeks the death penalty." TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(a)(1). And article 37.071, section 2 only becomes relevant when the trial court holds "a separate sentencing proceeding" after the jury has found a defendant "guilty of a capital offense." See id.
Here, the State did not seek the death penalty,[8] and the trial court did not hold a sentencing hearing as contemplated by article 37.071, section 2. See id. Instead, upon the jury's finding of appellant's guilt, the trial court immediately imposed the statutorily mandated sentence of confinement for life. See TEX. PENAL CODE ANN. § 12.31(a)(1) (providing for mandatory life sentence for juvenile offender convicted of capital felony); TEX. GOV'T CODE ANN. § 508.145(b) ; Lewis , 428 S.W.3d at 862-63 ("Life imprisonment, with the possibility of parole, is the mandatory sentence for defendants convicted of capital murder for crimes they committed as juveniles."); see also Garza v. State , 435 S.W.3d 258, 259-60 (Tex. Crim. App. 2014) (after jury convicted juvenile offender of capital murder, defendant immediately sentenced to confinement for life and "[n]o sentencing hearing was conducted"); Alas v. State , No. 01-15-00569-CR, 2016 WL 4055580, at *3 (Tex. App.-Houston [1st Dist.] July 28, 2016, no pet.) (mem. op., not designated for publication) ("After the jury found [juvenile offender] guilty of capital murder, the trial court immediately pronounced punishment as 'confinement in the Texas Department of Criminal Justice Institutional Division for life,' consistent with [s]ection 12.31(a)(1).").
Moreover, we note that it would have been improper for the trial court to have instructed the jury about appellant's parole eligibility during the guilt phase of trial. See McClure v. State , 544 S.W.2d 390, 393 (Tex. Crim. App. 1976) ; see also Garcia v. State , Nos. 01-08-00247-CR, 01-08-00248-CR, 2010 WL 1053104, at *11 (Tex. App.-Houston [1st Dist.] Mar. 11, 2010, pet. ref'd) (mem. op., not designated for publication) ("It is improper to discuss ranges of punishment during the guilt-innocence stage of a trial ... because it encourages the jury to convict on the basis of the amount of punishment, rather than the facts supporting guilt.").
*408 Accordingly, we hold that appellant's trial counsel was not ineffective for not requesting a jury instruction pursuant to article 37.071, section 2(e)(2)(B).
Closing Argument
Appellant next asserts that his trial counsel "conceded [a]ppellant's guilt during [closing] argument" to the jury. During closing argument, appellant's counsel stated:
Twenty-eight years of experience. I know you're going to find him guilty of something. You have to. I mean, you have to. I would find him guilty. Anyone here in this room would find him guilty of something.
What are you going to find him guilty of? Capital murder? Did the [S]tate ... present sufficient evidence to find him guilty of capital murder or murder? If there is a reasonable doubt as to that he committed a capital murder, these instructions tell you you must find him guilty of murder.
In Texas in the United States of America any reasonable doubt is never ever given to the benefit of the State of Texas or whatever government jurisdiction is prosecuting the case. Reasonable doubt is always given to the defendant, whether it's reasonable doubt as to a crime was even committed to find someone not guilty, or if there's reasonable doubt that a higher charge was committed and you have the opportunity to find the person guilty of a lesser charge. This instruction tells you you have to find him guilty of the lesser charge, as much as that would pain you, as much as it would cause you to be sick of your stomach of seeing what you've seen the last couple of days. That won't be easy. I know.
....
You're going to find him guilty of something. There's no doubt. Absolutely you will. I know that. Everybody knows that. I can't stand up here and say, Rudy, your 28 years-it's like you started practicing yesterday, you want us to find him not guilty? Of course not. You've got to find him guilty of something. Of what? I submit to you you have to find him guilty of the murder, the lesser charge. The benefit of the doubt after you consider all the evidence, okay, resolve in favor of the defendant.
....
And I think that should be resolved as far as having a reasonable doubt as to whether he committed a capital murder. And I'd ask you to find him guilty of murder, not capital murder. Thank you, ladies and gentlemen.
(Emphasis added.) Appellant complains about the above emphasized statements made by his trial counsel.
Initially, we note that appellant did not file a motion for new trial in this case and the record is silent as to his trial counsel's specific strategy during closing argument. See Menefield v. State , 363 S.W.3d 591, 592-93 (Tex. Crim. App. 2012) ("An ineffective-assistance claim must be firmly founded in the record and the record must affirmatively demonstrate the meritorious nature of the claim." (internal quotations omitted)); Rylander v. State , 101 S.W.3d 107, 110-11 (Tex. Crim. App. 2003) ("[T]rial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective."); Bone v. State , 77 S.W.3d 828, 835 (Tex. Crim. App. 2002) ("Ineffective assistance of counsel claims are not built on retrospective speculation; they must 'be firmly founded in the record.' "). However, attempting to persuade a jury to convict a defendant of a lesser-included offense has routinely been held to constitute a reasonable trial strategy. See Hathorn v. State , 848 S.W.2d 101, 118 (Tex. Crim. App. 1992) ;
*409 Belton v. State , 900 S.W.2d 886, 901 (Tex. App.-El Paso 1995, pet. ref'd) ("Requesting the jury to find [defendant] guilty of a lesser included offense can be a sound trial tactic[.]"); Brown v. State , 866 S.W.2d 675, 681 (Tex. App.-Houston [1st Dist.] 1993, pet. ref'd) ("A defendant's trial counsel does not necessarily render ineffective assistance ... by even conceding the defendant's guilt."); Jordan v. State , 859 S.W.2d 418, 421-22 (Tex. App.-Houston [1st Dist.] 1993, no pet.) ("It is logical to conclude that trial counsel, faced with overwhelming evidence of [defendant]'s guilt, chose to placate the jurors rather than to possibly antagonize them with an impassioned, though weakly supported, plea for a verdict of not guilty."). And given the overwhelming strength of the State's evidence in this case, we cannot say that such a strategy by appellant's trial counsel would have been illogical or unreasonable. Hathorn , 848 S.W.2d at 118 ; Belton , 900 S.W.2d at 901 ; see also Delrio v. State , 840 S.W.2d 443, 447 (Tex. Crim. App. 1992) ("That [defendant] was ultimately assessed the maximum punishment means only that the risk did not pay off; it does not mean the strategy was unacceptable....").
Accordingly, we hold that trial counsel was not ineffective for "conced [ing] [a]ppellant's guilt during [closing] argument" to the jury.
Failure to Object
Finally, appellant asserts that his trial counsel failed to object to his sentence as unconstitutional under the Eighth Amendment, thereby possibly "waiv [ing] the error ... forever."
In order to show that his trial counsel's decision not to object to appellant's sentence as unconstitutional constituted ineffective assistance, appellant must demonstrate, at a minimum, that the trial court would have erred in overruling such an objection. Ex Parte Martinez , 330 S.W.3d 891, 901 (Tex. Crim. App. 2011) ; Jagaroo v. State , 180 S.W.3d 793, 800-01 (Tex. App.-Houston [14th Dist.] 2005, pet. ref'd) (where defendant asserts counsel ineffective for failure to object to punishment as cruel and unusual, he must show trial court would have erred in overruling objection).
Here, we have already held that the mandatory sentencing scheme of Texas Penal Code section 12.31(a)(1) and Texas Government Code sections 508.145(b) and (d)(1) does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. See supra. Thus, any objection to appellant's sentence on this ground would have been futile. It does not constitute ineffective assistance for trial counsel to forego making a frivolous objection. See Jagaroo , 180 S.W.3d at 800-01 ; Edmond v. State , 116 S.W.3d 110, 115 (Tex. App.-Houston [14th Dist.] 2002, pet. ref'd).
Accordingly, we hold that appellant's trial counsel was not ineffective in not objecting to appellant's sentence as unconstitutional under the Eighth Amendment.
We overrule appellant's second issue.
Conclusion
We affirm the judgment of the trial court.

See Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2016).

See itation index="122" url="https://cite.case.law/citations/?q=Tex.%20Code%20Ann.%20%C2%A7%2019.03">id. § 12.31(a)(1) (Vernon Supp. 2016); see also Tex. Gov't Code Ann. § 508.145(b) (Vernon Supp. 2016) (requiring juvenile offender convicted of capital felony to serve forty years confinement before becoming eligible for parole).

See U.S. Const. amend. VIII.

The complainant was ten years old.

The Texas Legislature amended Texas Government Code section 508.145(d), effective January 1, 2017. See Act of May 26, 2015, 84th Leg., R.S., ch. 770, § 2.51, 2015 Tex. Gen. Laws 2321, 2385 (current version at Tex. Gov't Code Ann. § 508.145(d) ). Because this case was tried in February 2016, all citations to section 508.145(d) are to the version of the statute in effect prior to the 2017 amendments. The statute previously stated:
An inmate serving a sentence for an offense described by Section 3g(a)(1)(A), (C), (D), (E), (F), (G), (H), (I), (J), or (K), Article 42.12, Code of Criminal Procedure, or for an offense for which the judgment contains an affirmative finding under Section 3g(a)(2) of that article, or for an offense under Section 20A.03, Penal Code, is not eligible for release on parole until the inmate's actual calendar time served, without consideration of good conduct time, equals one-half of the sentence or 30 calendar years, whichever is less, but in no event is the inmate eligible for release on parole in less than two calendar years.
Tex. Gov't Code Ann. § 508.145(d)(1) (Vernon 2012); see also Shalouei v. State , No. 14-15-01055-CR, 524 S.W.3d 766, 770 n. 3, 2017 WL 924526, at *3 n.3 (Tex. App.-Houston [14th Dist.] Mar. 7, 2017, pet. ref'd) (analyzing prior version of statute).

The State argues that appellant has not preserved his constitutional complaint for our review because he did not raise it in the trial court. See Tex. R. App. P. 33.1(a)(1). However, because the outcome of this issue bears on appellant's ineffective-assistance-of-counsel claim, we presume for purposes of this opinion that his third issue was preserved.

We must further reject appellant's assertion that the complained-of Texas sentencing scheme requires juvenile offenders to serve more time than similarly-situated adults. Appellant attempts to compare adult offenders convicted of non-capital offenses with juvenile offenders convicted of capital offenses. The comparison is inapposite; if the minimum required sentences of identical offenses are compared for adult and juvenile offenders, then the sentences imposed on adult offenders are either the same or longer than the commensurate juvenile sentences. See Tex. Penal Code Ann. § 12.31(a)(1)-(2) (adult offenders convicted of capital offenses receive sentence of life without parole, while juveniles offenders receive life with possibility of parole); Tex. Gov't Code Ann. § 508.145(d)(1), (2) (making no distinction between juvenile and adult offenders convicted of felony offenses other than capital murder). The Fourteenth Court of Appeals has also rejected this assertion. See Shalouei , 524 S.W.3d at 769 n. 2, 2017 WL 924526, at *3 n.2.

See Roper v. Simmons , 543 U.S. 551, 575, 125 S.Ct. 1183, 1198, 161 L.Ed.2d 1 (2005) (holding death penalty cruel and unusual when imposed upon juvenile offender); see also Tex. Penal Code Ann. § 12.31(a)(1) (providing for mandatory life sentence for juvenile offender convicted of capital felony); Tex. Gov't Code Ann. § 508.145(b) (requiring juvenile offender convicted of capital felony serve forty-years confinement before becoming eligible for parole).