**AFFIRM AS MODIFIED; and Opinion Filed November 8, 2024**



In The
# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-23-00522-CR

**IVAN PIEDRA, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 265th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F20-75098-R**

## MEMORANDUM OPINION
Before Justices Pedersen, III, Smith, and Garcia
Opinion by Justice Smith

A grand jury indicted appellant Ivan Piedra for murder. *See* TEX. PENAL CODE ANN. §19.02. A jury found him guilty of murder and assessed punishment at forty-two years' confinement. In two issues, appellant asserts that the trial court erred in failing to instruct the jury on spoliation of evidence and the lesser included offense of criminally negligent homicide. In a cross-issue, the State requests that we modify the judgment to reflect appellant's correct plea, that his trial was before a jury, and that he did not enter into a plea agreement with the State. For the following reasons, we modify the trial court's judgment and affirm the judgment as modified.

## Background

The evidence at trial showed that appellant fired multiple gunshots at eighteen-year-old Mark Lemmons's car. One of the bullets entered the car's front windshield and pierced Lemmons's head. Lemmons died fourteen days later.

The evening of January 4, 2020, Lemmons and his girlfriend Abril Altamira drove by appellant's house. Altamira testified that, at the time, they were on the way to a tire shop. Lemmons received a call from appellant's cousin Johnny and told Altamira that he "was going back to talk to Johnny." After they left the tire shop, Lemmons drove by appellant's house again and "burn[ed] out" in an intersection at the end of appellant's street. Altamira saw appellant running toward the car, and Lemmons told her to put her head down. As she lowered her head, she saw that Lemmons had been shot. Altamira testified that neither she nor Lemmons had a gun. She knew that Lemmons and appellant "had a problem," but did not think it was so serious that appellant would take Lemmons's life.

Police determined that one bullet pierced the front windshield of Lemmons's car on the driver's side, and another entered the lower rear passenger-side door. According to a Dallas Police Department (DPD) crime scene analyst, unfired cartridges and fired cartridge casings recovered from the scene matched the same make and model of casings and cartridges found in appellant's house. Police did not recover the gun used by appellant or any other gun at the crime scene.

DPD Detective Timothy Johnson testified that he executed a search of appellant's house and seized a digital video recorder (DVR) connected to a home surveillance system. He then obtained a search warrant for the DVR's contents and extracted video recordings from it. The State offered, and the jury viewed, copies of the recordings. Detective Johnson testified that the recordings showed Lemmons's vehicle "burning off" or "peeling out" at the intersection of Fair Vista and Military Parkway followed by appellant running approximately thirty yards towards the intersection, "post[ing] up, punch[ing] out with the weapon and fir[ing] multiple times." Still holding the gun, appellant ran back to his house and, moments later, left in a vehicle.

Appellant testified that he sold Lemmons a car in early 2019, but Lemmons made only one payment. After appellant told Lemmons's brother about the debt, Lemmons paid in full, but he was offended that appellant had contacted his brother. Thereafter, whenever Lemmons saw appellant "out in the street," Lemmons would "bully" appellant by revving his car engine, cutting appellant off in traffic, "throwing his car at [appellant], rushing [appellant], getting in front of [appellant], braking," tailgating, or burning out nearby. Lemmons also did "donuts" at the end of appellant's street.

Appellant testified that, around 10:20 p.m. on January 4, 2020, he heard three or four gunshots as Lemmons drove by his house. Appellant knew Lemmons was driving by because his car made a distinct sound. Appellant's house was equipped

–3–

with a DVR and, at "that same moment," he reviewed the cameras, so he knew Lemmons had fired shots into the air.

Appellant retrieved his .45 caliber handgun from under his mattress, loaded it, went outside, and "shot the ground twice." He testified that he fired the shots "just to let [appellant] know that I have a gun as well. So if I have use [sic] it, I will. Basically, self-defense, you know . . . warning shots as well." Appellant believed Lemmons was going to try to "hurt" or "do something to" him. Appellant knew of a prior incident in which Lemmons had pulled a gun on someone.

Appellant's cousin Johnny called Lemmons and asked him to not drive by again because he was "scaring us [and] scaring the kids." Lemmons, however, "sp[un] back around," and his car, about half a block away, was facing appellant's house. Appellant believed Lemmons was "coming back." Fearing for his life and the lives of his friends and family inside the house, appellant ran down the street with "no plan," just trying to "scare [appellant] away." He fired three shots. Appellant explained that, although Lemmons's car was facing him, he aimed his gun at the car's back tires because he knew it was "reckless to shoot up in the air." According to appellant, the gun's caliber was "so powerful" that it recoiled, and recoil caused one of the bullets to enter the windshield and Lemmons's head.

Not knowing at the time that he had shot Lemmons, appellant ran back to his house, left, and never returned to get his belongings. He never called the police and learned that Lemmons died about three weeks after the shooting.

–4–

The jury charge contained instructions on murder, the lesser included offense of manslaughter, self-defense, and defense of third persons. Appellant requested additional instructions on spoliation of evidence and the lesser included offense of criminally negligent homicide, but the trial court denied his requests. The jury found appellant guilty of murder and sentenced him to forty-two years' confinement, the trial court signed a judgment, and this appeal followed.

**Jury Instruction Error**

In two issues, appellant contends the trial court erred in rejecting his requested instructions on spoliation and criminally negligence homicide. The trial court must submit a charge to the jury "distinctly setting forth the law applicable to the case." *Alcoser v. State*, 663 S.W.3d 160, 164–65 (Tex. Crim. App. 2022) (citing TEX. CODE CRIM. PROC. arts. 36.13, 36.14). When an appellant challenges the charge, we first determine whether it is erroneous. *Id.* at 165. If so, we decide whether the appellant was harmed by the erroneous charge. *Id.*

1.    Spoliation Instruction

In appellant's first issue, he complains that he was entitled to a spoliation instruction because the DPD placed his home surveillance DVR in a compromised location and it "was destroyed by ransomware."

The State has a duty to preserve evidence in its possession "that might be expected to play a significant role in [a] suspect's defense." *Arthur v. State*, No. 05-18-00075-CR, 2019 WL 3729499, at *7 (Tex. App.—Dallas Aug. 7, 2019, no pet.)

(mem. op., not designated for publication).  A spoliation instruction is a possible sanction for the State's improper loss or destruction of evidence.  *Id.* at 8; *see Guzman v. State*, 539 S.W.3d 394, 401–02 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).  When a defendant asserts that lost or destroyed evidence might have exonerated him, the evidence in question is "potentially useful."  *Arthur*, 2019 WL 3729499, at *8 (citing *Ex parte Napper*, 322 S.W.3d 202, 231, 238 (Tex. Crim. App. 2010)).  To receive a spoliation instruction related to potentially useful evidence, the defendant bears the burden of establishing bad faith on the part of the State.  *Id.*  In this context, bad faith is more than being aware that one's action or inaction could result in the loss of evidence.  *Id.*  It "involves an improper motive, such as personal animus against the criminal defendant or a desire to prevent the criminal defendant from obtaining potentially useful evidence."  *Id.*  There must be some evidence from which an inference of bad faith can be drawn.  *Id.*

Appellant asserts that his DVR should have recorded Lemmons discharging a gun into the air shortly before appellant shot him, contradicting testimony at trial that Lemmons had no gun.  Because "the police failed to investigate his version of events and then deliberately placed his evidence in a digital location [that] turned out to be insecure," appellant contends that "a juror could infer that the police intended to hide this evidence" from him.

Appellant, however, did not request a spoliation instruction based on the DVR's loss or destruction.  Instead, he requested a spoliation instruction "related to

–6–

the apparent erasure of Abril Altamira's initial interview by the police after this incident." To preserve error for appellate review, a defendant must make a timely request, objection, or motion stating the grounds for the ruling he seeks with sufficient specificity to make the trial court aware of his complaint, unless the specific grounds were apparent from the context. TEX. R. APP. P. 33.1(a). The defendant need not use "specific words" but must "let the trial court know what he wants and why he feels himself entitled to it clearly enough for the judge to understand him." *Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016). Whether a particular complaint on appeal is preserved depends on whether it comports with the complaint made at trial. *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009). Because appellant never argued in the trial court that a spoliation instruction was warranted because his DVR or its recordings were lost or destroyed, he has not preserved the complaint for our review. *See Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013) ("A defendant cannot complain on appeal about the trial judge's failure to include a defensive instruction that he did not preserve by request or objection: he has procedurally defaulted any such complaint.").

Even had appellant preserved his challenge, we find no error on this record. DPD crime analyst Nicole Mejia testified that, at the time of trial, DPD's computer systems were down due to a ransomware attack. Without access to the computer systems, they were not able to determine the location of evidence in the property room where DPD stored all of its evidence. Mejia noted that she had not been asked

to bring any evidence to trial, but if it had been necessary for use at trial, she might have been able to find it. Detective Johnson testified that appellant's DVR was in the property room, but Johnson did not know, because of the computer issues, whether they had the ability to locate it there. He also did not know how "far back" appellant's DVR recorded on January 4, 2022. He testified that, if the DVR recorded events leading up to the shooting, they should be on the DVR. Appellant testified that it would have been important for his case to have the DVR, but acknowledged that he and his attorney could have asked to see it during the two years his case was pending before trial.

Appellant did not demonstrate that the State acted with an improper motive, such as personal animus against him or a desire to prevent him from obtaining useful evidence. Appellant and his attorney could have, but did not, request the DVR prior to the ransomware attack. Further, the evidence showed that, even at the time of trial, DPD might have been able to locate the DVR in the property room. Accordingly, we conclude that appellant did not carry his burden to show bad faith and the trial court did not err in rejecting a spoliation instruction. *See Arthur*, 2019 WL 3729499, at *8; *Guzman*, 539 S.W.3d at 402 (concluding spoliation instruction was not required where defendant failed to establish potentially useful evidence destroyed in bad faith). We overrule his first issue.

2.    Criminally Negligent Homicide Instruction

In a second issue, appellant contends that the trial court erred in refusing to instruct the jury on the lesser included offense of criminally negligent homicide. We apply a two-step test to determine whether a defendant is entitled to a lesser-included offense instruction. *Ritcherson v. State*, 568 S.W.3d 667, 670 (Tex. Crim. App. 2018). We first compare the statutory elements of the alleged lesser offense with the statutory elements of the greater offense and any descriptive averments in the indictment. *Chavez v. State*, 666 S.W.3d 772, 776 (Tex. Crim. App. 2023). If the lesser offense differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission, the first step has been satisfied. TEX. CODE CRIM. PROC. art. 37.09(3). Under the second step, we determine whether there is evidence from which a rational jury could find the defendant guilty of only the lesser offense. *Ritcherson*, 568 S.W.3d at 671.

Appellant was charged with murder, the trial court instructed the jury on both murder and manslaughter, and the jury convicted appellant of murder. A person commits an offense of criminally negligent homicide if he causes the death of an individual by criminal negligence. TEX. PENAL CODE § 19.05(a). Criminally negligent homicide is a lesser included offense of murder because the only difference in the offenses is that the lesser culpable mental state of criminal negligence suffices to

establish its commission.[1]  *See id.* § 19.02(b)(1), (2) (providing that a person commits murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual); *Cardenas v. State*, 30 S.W.3d 384, 392–93 (Tex. Crim. App. 2000) ("[w]e have recognized that manslaughter, criminally negligent homicide and aggravated assault are lesser-included offenses of murder").  Accordingly, the first step is satisfied in this case.

The second step of the test is satisfied "if there is (1) evidence that directly refutes or negates other evidence establishing the greater offense and raises the lesser included offense or (2) evidence that is susceptible to different interpretations, one of which refutes or negates an element of the greater offense and raises the lesser offense." *Ritcherson*, 568 S.W.3d at 671.  The evidence need not be controverted or even credible. *Id.*  We consider all the evidence admitted at trial, and if there is more

---

[1] Culpable mental states are classified according to relative degrees from highest to lowest as follows: (1) intentional; (2) knowing; (3) reckless; and (4) criminal negligence.  TEX. PENAL CODE § 6.02(d).  The culpable mental state for murder is intentional or knowing, the culpable mental state for manslaughter is recklessness, and the culpable mental state for criminally negligent homicide is criminal negligence.  *See id.* §§ 19.02, 19.04, 19.05.  The penal code defines criminal negligence as follows:

> A person acts with criminal negligence, or is criminally negligent, with respect to . . . the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that . . . the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(d).  A person acts intentionally, or with intent, with respect to the result of his conduct when it is his conscious objective or desire to cause the result.  *Id.* § 6.03(a).  A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.  *Id.* § 6.03(b).  A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur.  *Id.* § 6.03(c).

than a scintilla of evidence raising the lesser offense and negating or rebutting an element of the greater offense, the defendant is entitled to an instruction on the lesser offense. *Id.*

To support a conviction for criminally negligent homicide, the evidence must establish that (1) the defendant's conduct caused the death of an individual; (2) the defendant ought to have been aware that there was a substantial and unjustifiable risk of death from his conduct; and (3) his failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under like circumstances. *Montgomery v. State*, 369 S.W.3d 188, 192–93 (Tex. Crim. App. 2012). We view the circumstances from the defendant's standpoint at the time that the allegedly negligent act occurred. *Queeman v. State*, 520 S.W.3d 616, 623 (Tex. Crim. App. 2017). "Criminal negligence does not require proof of [a defendant's] subjective awareness of the risk of harm, but rather [the defendant's] awareness of the attendant circumstances leading to such a risk." *Id.* at 622 (quoting *Montgomery*, 369 S.W.3d at 193). "The key to criminal negligence is not the actor's being aware of a substantial risk and disregarding it, but rather it is the failure of the actor to perceive the risk at all." *Id.* Thus, for the second step to be met in this case, the record must contain some evidence to raise an issue of whether appellant ought to have, but did not, perceive a substantial and unjustifiable risk from his conduct.

Appellant directs the Court to his testimony that he was trying to shoot only the tires on Lemmons's car. Appellant's testimony, however, does not raise an

–11–

inference that he was not, but ought to have been, aware of a substantial and unjustifiable risk in his conduct. Instead, the evidence shows that appellant was familiar with guns, knew how to use them, and understood that they were dangerous. He kept his own handgun, which he described as having a "powerful" caliber, unloaded and under his mattress. He understood that his gun recoiled. Appellant acknowledged that "it's reckless to shoot up in the air," and when he initially fired "warning shots," he fired into the ground. Nevertheless, he ran towards Lemmons's car minutes later and, assuming Lemmons was in the car, "post[ed] up" in a firing stance and fired his gun. Afterwards, appellant left the scene, never returned to his house, and never contacted the police.

Considering all of the evidence at trial, we cannot conclude that appellant's testimony shows that he failed to perceive the substantial and unjustified risk that aiming and discharging his gun at Lemmons's car—even towards the car's tires—could result in Lemmons's death. *See Thomas v. State*, 699 S.W.2d 845, 850 (Tex. Crim. App. 1985) ("Evidence that a defendant knows a gun is loaded, that he is familiar with guns and their potential for injury, and that he points a gun at another indicates a person who is aware of a risk created by that conduct and disregards the risk."), *abrogated on other grounds by Najar v. State*, 618 S.W.3d 366, 371–72 (Tex. Crim. App. 2021); *Taylor v. State*, No. 05-17-00658-CR, 2018 WL 3640467, at *10–11 (Tex. App.—Dallas Aug. 1, 2018, no pet.) (mem. op., not designated for publication) (evidence that defendant brandished a loaded gun and fired a "warning

–12–

shot" to intimidate spectators shows that she was aware that she was, at least, committing an act clearly dangerous to human life and therefore the trial court did not err by denying criminally negligent homicide instruction); *Trujillo v. State*, 227 S.W.3d 164, 168 (Tex. App.—Houston [1st Dist. 2006], pet ref'd) (concluding that defendant's conduct in brandishing a loaded gun to frighten off some men with whom he was in an altercation shows that he either perceived or knew the risk of having a loaded gun). Furthermore, the evidence does not refute or negate that appellant either knowingly or recklessly caused Lemmons's death. Because there is no evidence from which a rational jury could find appellant guilty only of criminally negligent homicide, we further conclude that the trial court did not err in rejecting appellant's request for an instruction on the lesser included offense. We overrule appellant's second issue.

### Modifications to Judgment

In a cross-point, the State requests that we modify the judgment to reflect appellant's correct plea, that his trial was before a jury, and that he did not enter into a plea agreement with the State. The record reflects that appellant rejected the State's final plea offer and entered a plea of not guilty before the jury, and the jury then found him guilty and assessed punishment. The judgment, however, erroneously reflects that appellant entered into a plea agreement, waived a jury trial, and entered a plea of guilty.

When the record provides the necessary information to correct inaccuracies in the trial court's judgment, we have the authority to reform the judgment to speak the truth. TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we will modify the judgment to reflect that this was not a plea bargain case, appellant pleaded not guilty to the charge against him, and he was tried by jury. We sustain the State's cross-point.

## Conclusion

Having overruled appellant's issues and sustained the State's cross-point, we affirm the judgment of the trial court as modified.

/Craig Smith/
CRAIG SMITH
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
230522F.U05

–14–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IVAN PIEDRA, Appellant

No. 05-23-00522-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 265th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F20-75098-R.
Opinion delivered by Justice Smith. Justices Pedersen, III, and Garcia participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

(1) to replace "Judgment of Conviction by Court—Waiver of Jury Trial" with "Judgment of Conviction by Jury";

(2) to replace "Guilty" with "Not Guilty" in the section entitled "Plea to Offense"; and

(3) to remove "42 Years TDCJ No Fine" from section entitled "Terms of Plea Bargain".

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 8th day of November, 2024.